Jennifer H. v Paul F. (2004 NY Slip Op 51781(U))

[*1]

Jennifer H. v Paul F.

2004 NY Slip Op 51781(U)

Decided on June 9, 2004

Family Court, Suffolk County

Simeone, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 9, 2004

Family Court, Suffolk County
JENNIFER H., Petitioner(s),
against
PAUL F., Respondent(s).
V-11488-03

Law Guardian:Respondent's Attorney:Petitioner's Attorney:
Jane E. Bernstein, Esq.Mitchell A. Greebel, Esq.Taylor Walker, Esq.
Law Guardian Bureau170 Old Country Road 260 Jericho Turnpike
400 Carleton AvenueMineola, NY 11501 Westbury, NY 11590

Ettore Simeone, J.
Petitioner, Jennifer H. commenced the instant proceeding by Order to Show Cause dated July 9, 2003, seeking custody of the parties child, Madelyn F., d.o.b. 9/13/93. Petitioner alleges that she has always been a part of her daughter's life, that respondent was physically abusive to her and that respondent told her that he is going to relocate to Arizona with the child against her wishes.
 Respondent filed a cross-petition, dated July 10, 2003, seeking custody of the child alleging that he has been the primary caretaker for the child since birth and has always provided the child with a safe, stable and loving environment. Respondent claims that he is in the process of losing his business and believes that relocating to Arizona will enable him to provide a better quality of life for his daughter. Additionally, respondent contends that petitioner is constantly moving and changing employment and that she is unable to provide for herself from one [*2]paycheck to the next. Respondent seeks sole custody of the child with permission to relocate out of Suffolk County.
The Court conducted a hearing on the aforementioned petitions on March 1, 2004, March 22, 2004, April 2, 2004, April 19, 2004, April 20, 2004, April 21, 2004, and April 26, 2004 at which time the following evidence was adduced:
Findings of Fact
Petitioner met respondent in 1992 while both were working for a company in Los Angeles, California. After completing a sales training program there, respondent asked petitioner to be his business partner selling perfume in Stanford, Connecticut. The business failed and respondent decided to start similar business in Las Vegas, once again asking petitioner to join him in the venture. Petitioner described their relationship at the time as "friends" and "sometimes intimate". Subsequently, petitioner became pregnant and the parties child, Madelyn, was born in September of 1993. The parties were no longer "intimate" and petitioner claims that she was living with respondent out of financial necessity. Respondent's mother came to help them when the baby was born as petitioner was bedridden and both parties were "overwhelmed".
In December of 1993, respondent felt that it would be a "good idea" if they all moved to New York because respondent had plenty of family there to offer support. The three moved into respondent's sister Madeline's (for whom the child was named) basement apartment. Subsequently, respondent's sister wanted them to leave and they got an apartment in Flushing, Queens. Respondent began working as a "bouncer" in a bar and petitioner worked three days a week as a sales associate earning $9.00 per hour. Thereafter, in the spring of 1994, respondent moved to an apartment in Huntington and the child spent half her time with petitioner and the other half with respondent. In the fall of 1994, petitioner and the child moved in with respondent upon his suggestion. Petitioner indicated that at that time she was working at "A&S" department store earning $22,000.00 per year while respondent was working as a "bouncer and an "MC" at "Governor's Comedy Club.
Respondent began working at "Finnegan's", a bar/restaurant, in Huntington in 1995 and some months later, became a part-owner and manager of the business. Petitioner worked as a bartender there on and off from the time the parties lived in the Huntington apartment. Petitioner claims that respondent would repeatedly fire her when he got angry and then hire her back again. The parties continued to live together and in March of 1997, after a disagreement, respondent "yelled" at petitioner telling her to "get out", that the child was never going to live with her and that he would prove that she was "unfit". Petitioner claimed that at the time the respondent said to their four year old child "say goodbye to Mommy" and that petitioner left to stop the screaming. While petitioner indicated that she moved out, she stated that she stayed at respondent's apartment every night, took care of the child, got her to school and arranged for babysitting. Subsequently, respondent bought a house in Huntington and suggested that petitioner live on the first floor and pay him $900.00 in rent, while he lived upstairs with the child. Petitioner claims that respondent asked her to marry him, but that she did not want to and [*3]was afraid to tell him so. Further, petitioner claimed that respondent brought women to the house at times and that on two separate occasions, respondent showed up when she was out on a date. Respondent denied that he interfered with her social life, did not care if she dated and claims that petitioner invited him to show up at her date to see what he thought.
In 1998, petitioner got a job as a manager at "Loehman's" department store, earning $26,000.00 per year and continued to bartend at Finnegan's. Petitioner contends that respondent got very angry when she tried to go out with someone she met at Finnegan's and "manhandled" her, "shoved" her and called her "a cunt" and "a whore". When he got back to the house, she claims he threw her into the wall and on the bed, picked her up by her ears and choked her. Petitioner explains that she did not call the police because respondent threatened to prove that she was "a slut" and take the child away.
In October of 1998, petitioner asked respondent's permission to bring a man back to the house and while respondent agreed, thereafter things began to deteriorate. Petitioner alleges that respondent would wake her up in the middle of the night screaming at her and calling her "a loser" and "a filthy disgusting animal who can't keep her legs shut". Petitioner indicated that they always celebrated Christmas together, but that in December of 1998, respondent told petitioner in front of the child that "we are going to Aunt Connie's and you're not invited." Petitioner claimed that she was "terrified" when respondent became more antagonistic toward her, threatening to "kill her", "mulch her" stating "you never know what could happen in the middle of the night". Subsequently, respondent told petitioner to move out and in February of 1999, petitioner leased a one bedroom apartment in Brookville, explaining to the child that "mommy is going to move so that the yelling will stop." The child visited her there, but never spent the night.
Petitioner indicated that she felt bad about leaving, but that they were not living "separate lives" as planned, everything had to be respondent's way and that she felt like she was "appeasing the beast". Petitioner characterized the respondent as "very controlling". Petitioner continued to go to the house between 6:30 a.m. and 6:45 a.m., get the child on the bus and return to the house by 8:00 p.m. Petitioner claimed that respondent permitted her to stay the night and indicated that respondent had a couple of girlfriends who also stayed over. Respondent admitted to having "one-nighters" but claims that only two women stayed over his house in the past ten years and that he only introduced the child to three women. Respondent met his wife Liz in the year 2000 and petitioner would come and stay over on Tuesday nights so that they could go out.
Petitioner testified that she paid for groceries and medicine for the child, did laundry for the child and the respondent, and cleaned the child's room, all while she continued to live in Brookville. Petitioner produced receipts and checks she wrote (Petitioner's Exhibit "1" and"2") for expenditures she made on behalf of the child; including nursery school, medical and pharmaceutical expenses, groceries, clothing, shoes, toys, videos and other various items. Additionally, petitioner stated that she has attended open school nights and parent teacher [*4]conferences and reports that respondent only went to one a couple of weeks ago and one when the child was in kindergarten.
 In April of 2001, petitioner moved back to Huntington, seven minutes away from respondent's home, and indicated that her relationship with respondent was "not as violent" because respondent was happy with Liz. Respondent and Liz were married in November of 2002, and in March of 2003, had a baby boy "Peter", Madelyn's half-brother. Petitioner testified that she likes Liz, but that Liz "acquiesces" to respondent and lets respondent make all the decisions. Petitioner and respondent agree that Madelyn adores Liz and Peter.
Sometime in May of 2003, respondent told petitioner that he wanted to relocate to Arizona and offered that petitioner go too and that she live with him, Liz and Peter, and Madelyn for a period stating, "you have no man, and a crappy job". Even after petitioner told respondent that she did not want to move out of New York, respondent told the child that she too was moving to Arizona. Subsequently, in July of 2003, petitioner states that she was at respondent's house with Liz, Peter and the subject child, when respondent came home and began screaming at petitioner that she forgot to buy milk, telling her "you're good for nothing" and "what are you doing here anyway". Petitioner alleges that respondent proceeded to pick her up of the ground, choked her and dropped her after which petitioner kissed the child and left. Respondent followed her out and continued to yell "noone's going to stop me". After this incident, petitioner stated that she went to Family Court and a temporary order of protection was issued against respondent (petitioner's exhibit "3"), however petitioner failed to pursue the matter and the order was vacated. The same day that petitioner went to family court for the order of protection, she filed the instant custody petition.
The parties appeared in Court on November 12, 2003, and stipulated to a temporary order granting petitioner overnight visitation on Tuesday and Thursday evenings. Additionally, the stipulation provided for holiday visitation including overnights commencing Christmas Day at 12:00 p.m. and New Year's Day at 9:00 a.m. (Petitioner's Exhibit "5"). Notwithstanding, petitioner states that respondent refused to allow her to have the child for Christmas Day visitation, telling her that "you're not getting her tonight", "she's not finished opening her presents" and that "there is no court order of visitation". Additionally, respondent only permitted petitioner daytime visitation for New Years, refusing to allow the overnight visitation as agreed upon. Respondent did not deny refusing petitioner the agreed upon visitation but explained that he was "confused" about the stipulation. Despite the fact that petitioner had visitation on Easter Day, respondent asked his attorney to request time with the child even though he would not be with her because he would be out of town. Respondent contends that he was just trying to fulfill the child's wishes.
Petitioner testified that in August of 2003, respondent took the child to Arizona on vacation without telling her, looked at houses with the child and actually purchased one. The child has told both petitioner and respondent that she wants to move to Arizona, however, petitioner claims that respondent has depicted Arizona as "Disneyland", telling her that she will have a big house with a swimming pool and lots of friends. Despite Madelyn's expressed desire [*5]to go to Arizona with her father, petitioner feels that Madelyn does not understand what it will be like to be away from her mother and her father's extended family, with whom she is very close.
Over the past four years and prior to the instant proceedings, petitioner spent most of her free time with the child and respondent's family, particularly respondent's sister Madeline. Petitioner testified that she and the child spent many weekends at Madeline and her husband's house, and that she would babysit for their son Carlo while they went out and that they in turn would do the same for her. Petitioner admitted to drinking some weekends, but not to the point where she was "hung-over" the next day, as respondent claims. Petitioner also admits to being "sloppy" and "leaving clothes on the floor", but does laundry once a week. Further, petitioner denies respondent's other claims that she leaves food out or that she has "bugs" or "vermin" in her apartment. For the past two years, petitioner has taken the child to church on Sundays, sometimes with respondent's family.
Petitioner characterized respondent as "loud", "mentally unbalanced", "moody", "vicious" and "nasty", and states that he "berates" people and "gets into fights". She complained that he humiliated her incessantly by teasing and mimicking her at family gatherings. Additionally, petitioner contends that respondent suffers from depression and took medication at one point, but wouldn't take it all the time because it affected his sex drive. While petitioner stated that she would not describe respondent as a "good father", when presented with a 2003 father's day card (Respondent's exhibit "A"), in which she wrote "you're a wonderful father", petitioner admitted that she always thought he was "a very loving father." Notwithstanding, petitioner is seeking custody with supervised visitation for respondent because "he is not responsible" and "says things that are damaging emotionally". Petitioner testified that respondent has told the child such things as, "Mommy does not have unconditional love for you". Furthermore, petitioner expressed concern over the child visiting respondent in Arizona, for fear she would not be returned. When asked why she hasn't filed for custody prior to the instant petition, petitioner stated she was "afraid" and "just went along with it", but explained that "enough is enough" and she is now "older" and "stronger".
Currently, petitioner lives in a one bedroom apartment, paying $1,100.00 per month in rent and has determined that a two bedroom apartment in Huntington would cost between $1,300.00 and $1,500.00 per month. Petitioner intends to continue the child in the catholic school that she presently attends, if awarded custody. The child's school day ends at 2:00 p.m., and there is an after school program between 2:00 p.m. and 6:00 p.m., where the child can go and do homework with teachers. Presently, petitioner is employed as a "head buyer" for the shoe store "Foxes" and earned $57,000.00 in the year 2003 and petitioner sates that her gross income with bonuses ranges between $64,000.00 and $65,000.00 per year. Petitioner indicates that she works Monday through Friday and is required to travel for business approximately eight days per year at which time she would make arrangements for the child by taking the child with her, having her sister come from Tennessee to watch the child, or having the child stay at a friend's house. 
[*6]
Respondent testified that he met petitioner working at a company in California where petitioner was training salespeople. Respondent felt they would make a great team because he was "good at being inside" on the business end and she was a "great salesperson", so he suggested that they become partners in a business selling perfume door to door. Their business "folded" in Connecticut and Great Neck and respondent convinced petitioner to give it one more attempt in Las Vegas. Respondent describes their relationship in Las Vegas as "odd" and states that they were "intimate", even though he did not love her. Although respondent was initially shocked when petitioner told him she was pregnant, he told her "I love babies" and "we can do this". Respondent reassured her that she "will never be left alone", "you got big daddy". Their daughter Madelyn was born on September 13, 1993, while the parties were still living in Las Vegas. The last time the parties were "intimate" was six months into petitioner's pregnancy. The respondent characterized their relationship from that point on as "roommates raising a baby".
When the child was three months old, the parties moved to Long Island and into respondent's sister's basement. After a short period they moved to an apartment in Queens. During this period, respondent worked at Governor's Comedy shop as a bouncer, then a doorman and then a manager working late night shifts. Prior to that respondent testified that in the early 1990's he appeared as an actor on numerous talk shows in New York City where he played the same character, a male chauvinist designed to incite the audience. In March of 1994, respondent moved to a one bedroom apartment in Huntington, at which time he visited petitioner and the child regularly. In the fall of 1994 and upon respondent's suggestion, petitioner and the child moved in with respondent. Respondent indicates that the short period before the child moved from Queens to Huntington, was the only time she did not live with him. During the nights he worked at the Comedy club and during the days he fed the child, changed her, bathed her and tended to her needs. Since petitioner worked at a retail job during the day and he worked evenings, no babysitter was necessary.
Respondent began working at "Finnegan's" Bar/Restaurant in Huntington in 1995 and subsequently he became part owner and managed the business. The child attended Noah's Ark Nursery School where petitioner would drop the her off and respondent would pick her up; however petitioner frequently called last minute to say she'd have to work late, with respondent left to try and find someone to watch the child when he had to go to work. Respondent alleges that he paid for 99.9% of their food and always paid for the child's private school education not wishing to enroll her in the public system. Respondent admits that petitioner did attend parent-teacher conferences, but claims she only did so at his request and after he repeatedly expressed his frustration with her failure to share equally in the childcare responsibilities. Additionally, respondent had the child baptized and drove the child to Catechism once a week for two years.
In June of 1997, respondent purchased a house in Huntington and suggested that petitioner live in the downstairs of the house and pay $900.00 per month for rent, while respondent and the child lived upstairs. Despite their agreement, respondent alleged that petitioner was frequently unable to pay the full $900.00 in rent and that on many occasions he [*7]gave her money. He further indicated that petitioner's financial contribution toward the care of the child was "extremely minimal".
 By 1998, respondent stated that he was "disappointed" with petitioner's failure to "hold up her end of the bargain" and "disliked" the way she was always apologizing for her behavior, but told her "I love Madelyn more than I dislike you, so you can come and go as you please." Additionally, he complained about the "junk food" the petitioner constantly fed the child and described the many nutritious meals of grilled chicken, vegetables, rice, steak and cheeseburgers that he fed the child at his restaurant, emphasizing the importance of nutrition.
When respondent owned Finnegan's, he would be home with the child during the day, until a babysitter came between 7:30 p.m. and 8:00 p.m. before he went to work. Respondent stated that when he came in as a manager, the business was losing money, but that just seven months after he became a partner, he was able to pay back his debt. Business began to decline and in September of 2003, he sold the business after the income generated barely covered the expenses. Even though he borrowed money to put into the business, it continued to go "downhill". Respondent claims to have netted $140,000.00 from the sale of his business but that he had to pay back money he borrowed from family and friends as well as credit card bills. Respondent refinanced his home twice and currently has a mortgage of approximately $345,000.00 with monthly living expenses of $3,500.00 per month. It was unclear how he paid annual living of expenses of approximately $50,000.00 in 2001 and 2002, when his reported income was between $15,000.00 to $16,000.00 per year; however he agreed that it was a matter of "smoke and mirrors".
Respondent claims that he looked diligently for work in New York sending out resumes and searching the New York Times for positions in restaurant management. He got three interviews and one solid job offer, however it paid very little. Additionally, he looked into businesses in Huntington, Northport and Centerport, but to no avail. Respondent claims that he was considering relocating for six months and testified that he "has to move" to Arizona, that there are great houses and great prices and that his money will go a lot farther there. Respondent states that it costs approximately half as much to live in Arizona than it does in New York estimating annual living expenses to be $75,000.00 in New York and $40,000.00 in Arizona.
Respondent sold his home in Huntington for $415,000.00 and will net approximately $70,000.00 after paying off his mortgages and before paying a real estate broker's commission. Respondent went to Arizona with Liz and Madelyn in August of 2003, and purchased a brand new home with four bedrooms and three baths for $235,000.00. Even though Liz spoke with petitioner before they left, respondent explained that no one told petitioner he was taking the child to Arizona because he thought it should be "left it to his lawyer". Respondent indicated that he researched the grammar schools in Chandler, Arizona and that if they were not happy with the public schools, there was a private school, St. Timothy's that the child could attend. When asked whether he considered the affect such a trip would have on the child, if the Court [*8]denies his petition to relocate, he replied "I raised Madelyn", "I never conceived of a battle" and "I thought it was a no brainer".
 Respondent recently obtained employment in Arizona as a shift supervisor for a resort restaurant earning $11.00 per hour and since he was "overqualified", was promised a $2.00 per hour raise after ninety days and a promotion to manager after six months. Respondent works a minimum of forty hours per week during the course of five to six days. He is also currently negotiating to open a "J.B.'s" restaurant which will cost $6,000.00 per month to rent, fully equipped. Because he recognizes the high rate of failure in the restaurant business, he has also investigated the purchase of an "Entenmann's" route, which would net $75,000.00 per year, real estate ventures and a half a dozen other business opportunities. Respondent characterized himself as "hardworking" with "common-sense" and that "as a restaurant owner on a scale of 1 to 10, a 9".
Respondent indicates that the last time he spoke to petitioner about relocating, was prior to the commencement of the Court process when she asked him "how is this going to work again?" Respondent reassured her that "we're going to keep this together", that she can come out there, that he'd be coming back to visit his family and that Madelyn is at the point where she could fly by herself. He claims that petitioner hugged him saying "I always feel much better when I talk to you". Less than a week later, he was served with the court papers.
 Respondent contends that he is not a violent person and denies that he ever physically abused petitioner; however he did admit that he took hold of petitioner's wrists, turned her around and threw her out of his house, when an argument began over the lack of "milk" in the refrigerator. Respondent indicates that he was taking medication for anxiety and depression for very short periods and took himself off it, but not because it affected his sexual drive as petitioner claims. Respondent stated that petitioner did not purchase groceries or do laundry as she claimed and that she was "irresponsible", "deceitful" and could not be relied upon. While respondent stated that petitioner "occasionally pitched in", he characterized her as "a spider" that "hangs out" and who is "obsessed about finding a man".
It is respondent's contention that he was the "foundation" for Madelyn, that he bought a home for her and that if "she needs dance lessons, I write the check." Further, respondent stated that he spends time with Madelyn, has taken her to Disney World, Broadway shows and ten to twelve Mets games per year; that he is with her day after day, whereas, petitioner has been "in and out" of her life. Respondent recounts a time that he was with the child day and night when she was hospitalized, while petitioner came and went. Finally, respondent states that he gets up with Madelyn in the morning and is with her every night and that it is ridiculous for petitioner to think that she should have custody of the child.
While respondent admits to having some "one-nighters" with women, he claimed that only two women spent the night and that over the past three years, he only introduced three women to the child. One of the three gave birth to respondent's son "Dylan" in 1999, however he [*9]was not aware of this until August of 2001, when he received court papers concerning a "DNA test". Thereafter, he sent her money for bus fare, food and a hotel in Centerport so that she could bring the child to visit. Additionally, he went to visit them in Saratoga County on four occasions, bringing Christmas gifts, clothes, boots and sneakers. Currently, he pays child support of $559.00 per month for Dylan, but does not see the child because the mother has made it clear that he is "unwelcome" and "does not want him around." While respondent has introduced Dylan to several members of his family, Madelyn has not been made aware of his existence.
During the course of these proceedings, the Court ordered that a forensic examination be conducted and appointed Dr. Reubins, M.D. (Petitioner's Exhibit "6"), a psychiatrist, highly experienced in child custody matters. Respondent stated that he met with Dr. Reubins twenty to twenty-two times. During the course of the examination, he claimed that Dr. Reubins constantly "harped" on all the girlfriends petitioner alleged he had. Further, he claims Dr. Reubins told him, "I understand that you're a dictator" and that "I would make sure you know what your family really wants". It was at this point respondent went home and had a "pow-wow" with his wife, Liz and Madelyn which he characterized as an "open family discussion." He indicated that the "pow-wow" lasted thirty minutes and that Liz took notes, which he later presented to Dr. Reubins and were entered into evidence. (Petitioner's Exhibit "8")
The pow-wow notes stated verbatim the following:
"I talk openly withPow Wow 1/22/04
Madelyn - for years"3-4:30
Liz
Dad
Mad
PROS FOR MOVING TO ARIZONA
1.Being with her whole family she is use [used] to being with. Has always lived with.
2.A lot less change of her- life by staying with the family she knows. Her Dad, 2nd Mom, baby brother, dog and Grandparents.
3.2nd Mom will be Home for her - Stay at home Mom - Always - no babysitters, sleep- overs with strangers taking care of her.
4.Won't have to be exposed to a single persons lifestyle (i.e. working 50+ hours a week - traveling for work - sloppyness [sloppiness], dating, to [too] confusing for a little girl)
5.2nd Mom will be there for sick days (unexpected) half school days, vacations, to drive her to - activities - friends, etc.
6.We are there to supervise homework getting done properly.
7.A full time family to support her in everything she needs.
8.Nutrition - balanced diet- of homemade dinners every night as a family! not a life of junk food like at Jennies.
[*10]
9.A BIG beautiful home with own space and room - a growing girl needs.
10.exposed to cultured life- family trips - educational and fun trips.
11.Madelyn's heart and soul. is going to Arizona - excited and happy.
12.Looking forward to meeting new friends and going to a new school - while still staying in touch with her friends by email and phone calls.
13. A private neighborhood where she can ride her bike and play with all the children in our community safely and supervised.
14.All the close family we have are all excited about us going so they can come and spend time with us and possible relocate themselves.
15.Year round sunshine and an abundance of recreation activities available for her, outdoor and indoor
16.The warm climate would help her asthma.
17.Growing up with and helping her baby brother, she wished to have, ever since can remember.
18.Being with her Dad, as she has always been for 10 years is something she needs and wants not to change.
19.Will stay happily in touch with her mother thru - phone calls, emails and vacation times.
20.A beautiful pool to swim and get exercise all most all year round.
"WHAT WE ARE AFRAID OF"
CONS FOR STAYING IN NY
1.Being exposed to a Bachelor life.
2.Will be devistated [devastated] to be away from Daddy, Liz, Peter, and Patton.
3.Living in a small basement, 1 bedroom apartment, always has lived in a house.
4.Not knowing who will care for her while Jennie is working, or out trying to have a social life.
5.Strangers babysitting, not being able to do other activities.
6.Jennie does not have the means to take care of Madelyn to have a normal life. She buys everything with a credit card, including food
7.Jennie is dirty, unorganized and hasn't ever raised Madelyn on her own.
8.This could mean a life of drugs and high school drop out - verse - going to the best schools, going to college, because of a loving supervised normal family structure.
9.The public school system in Huntington is very poor. The reason why Paul has paid for Madelyn to go to Catholic School she will be going to public school if she lives with Jennie.
10.Lonely, devistated [devastated], isolated, depressed away from the life she is used to with her family.
11.Desperately afraid of the role model she will have to look up to "no boyfriends, no $, no life, and focuses on all the bad stuff - had never eaten properly - lives on diet coke, and ice cream, taco bell, burger king.
12.negative talk about people Madelyn loves dearly.
13.Speaking to Madelyn like she is her adult friend with problems at work and social-
14.Having to take her to work often on weekends, or work related trips to the mall to check the stores.
15.Not being able to taking Madelyn to the Doctors if needed because she works.
[*11]
16.Madelyn will be excluded from Paul and Liz's family while in Jennie's care because she is not welcome.
17.Not having the lifestyle she is acustom [accustom] to - i.e. computer, internet - her own t.v. to watch her shows and movies, video games on Big screen t.v. her own bathroom, bedroom.
18.The common sense that Jennie (lacks) does not have - she is a selfish and watches out only for herself - has always put herself No.1 - before anyone including her daughter.
19.Can't even be on time to pick up Madelyn on the nights she sees her now ALWAYS LATE!
Respondent claims that when he held this "pow-wow", he asked the child to "tell me everything about Arizona and New York, staying and going" and that Liz wrote down "the spirit of what was said". After they finished discussing the issue of relocating with Madelyn, he and Liz "stayed behind going over the notes and filling them in." Respondent presented the notes to Dr. Reubins, but claims that he never showed the notes to Madelyn. Respondent alleged that the pow-wow notes in evidence were "incomplete", but does not know what happened to the pages missing. He emphasized that he held the "pow-wow" because he believed Dr. Reubins wanted him to do this to find out his family's true feelings regarding the relocation.
Dr. Reubins testified that during the course of his evaluation he met with the parties and the child cumulatively forty-two times and prepared an extensive report. (Petitioner's Exhibit "7"). Dr. Reubins characterized the "pow-wow" notes presented to him by respondent as "the most compelling example of parental alienation I've ever seen" defining "parental alienation" as "a conscious or unconscious attempt to alienate a child from a parent". When Dr. Reubins expressed his surprise that respondent would say these things to the child, respondent replied "I've talked openly with Madelyn for years". Dr. Reubins stated that respondent's "pow-wow" was tantamount to "brainwashing", by attempting to teach the child what she "should" believe. Further, Dr. Reubins testified that he did not instruct respondent to conduct this "pow-wow" and that it was clearly not in the best interests of the child.
 It was Dr. Reubin's opinion that petitioner was "clearly involved in the child's life" despite respondent's contention that petitioner was merely a "babysitter" and "contributed very little to the child's care". Dr. Reubins states in his report that both parties acknowledge that Madelyn was raised in an "extended family" and that for many years respondent was working odd hours and shared the care taking with petitioner. When both parties worked they enlisted the assistance of respondent's extended family, including respondent's mother and respondent's sister "Aunt Madeline".
Dr. Reubins described Madelyn as "a delightful but confused ten year old child" and states that "her confusion and excitement to move to Arizona is unusual given the history she has with her mother." Dr. Reubins attributes her desire to move to respondent's "intrusive behavior" as exemplified by the "pow-wow" respondent conducted. The "pow-wow" was further described by Dr. Reubin in his report as, "a candid example of negative influencing of a child against mother and positive brainwashing toward a goal."
[*12]
In evaluating parenting and discipline, Dr. Reubins indicated that respondent "has zeal and desire to parent properly, although his parenting can be without insight into how discipline is best meted out." Petitioner's approach was stated to be "far more child-centered and compassionate" and that "this went along with [petitioner's] general approach to her daughter in a consistent and focused parenting style." Dr. Reubins added that both parties "are poorly given to conflict resolution." Petitioner presents as "a victim" and "a frightened recipient of [respondent's] rage" experiencing "difficulty negotiating with him because of her fear." Whereas, respondent sees petitioner as "a stupid, weak woman who makes bad choices and whose choices are dangerous to follow." Such a divergence "makes it impossible for the two of them to compromise and reach an agreement". Dr. Reubins states in his report that "respondent has no appreciation of [how his desire to relocate] would affect Madelyn or her mother, or that what he wants is all that should concern everybody."
Dr. Reubins further opined, that "Madelyn should not be permitted to leave the New York area and relocate with her father and stepmother. Given the significance of Madelyn's relationship with her mother and extended family, it is recommended that petitioner be the sole custodial parent of the parties child." Contrary to respondent's contentions, Dr. Reubins finds petitioner was involved as "an active and engaged mother who is currently looking after her child's best interests, although sharing care taking of her with her father and his family." Further, Dr. Reubins finds that "[a] removal of Madelyn at this point in her life from her mother would not be in her best interests and would deprive her of an elemental and significantly important relationship....The presumption that this relationship would survive based on email, telephonic communication, and occasional visits, is naive and by its nature denies Madelyn's attachment to her mother and the extended family." Dr. Reubin noted that respondent's intention to relocate is "reflective of his belief that Madelyn's mother is dispensable, a significant mis-appreciation of Madelyn's needs and life."
Various members of respondent's family also testified including his two sisters, his mother, his sister-in-law and his brother. Respondent's brother, Peter F testified that he lived a block away from respondent and petitioner when they lived in Queens and when he would visit petitioner at the apartment, it was unkempt and in disarray with paint cans, boxes and clothes on the floor. Additionally, Mr. F stated that when the parties shared a house in Huntington, petitioner lived in the downstairs of the house which was also quite disorganized.
Peter F indicated that respondent and the child had a strong bond and that he worked his business day around the child, spending plenty of time with her; taking her to the movies, Mets games, Disney World, and play-dates; whereas petitioner spent time at the bar when she could have been spending time with the child. He further described respondent as "loud, loving and loyal" and a "take charge person" and was unaware that petitioner was at all upset by respondent's "teasing" indicating that their interaction was "normal". While he admits his brother is "aggressive" and "likes to dictate"; he states that respondent "does not lose his temper." When asked whether the family members are afraid to contradict respondent, he replied "we are opinionated people and no one is afraid to speak their mind."
[*13]
Respondent's sister Madeline L testified that she had a "nice" relationship with petitioner and that she frequently saw her and the child on weekends when respondent was working, even after petitioner and respondent stopped living together. Mrs. L's husband, Carl testified as well that he saw petitioner and the child a lot, that they would be at his house on weekends and that petitioner was always a part of the child's life. Since the commencement of the instant proceedings, however, both Mr. and Mrs. L state that they have not seen petitioner or the child as often, with Ms. L surmising that petitioner does not wish to place her in an awkward position. Despite the fact that she has had less contact with petitioner and the child, Mrs. L readily agreed to provide childcare assistance to petitioner when needed.

Mrs. L stated that petitioner is "very involved" with the subject child and when asked about petitioner's dating habits, she indicated that petitioner "does not date that much" and that she "wraps herself up with her child and her job". Further, Mrs. L described petitioner as a "nice mother" who "loves her child unconditionally", but also characterized her as "timid" and "afraid to make respondent unhappy". Respondent testified that his sister was lying when she described the amount of time petitioner and the child spent with her, because she and her husband wanted custody of his child, which respondent claimed they joked about on more than one occasion. Respondent admitted that he was upset with his sister's testimony and telephoned his mother to talk to her about it afterwards. Respondent's mother indicated that she was "disappointed" with her daughter Madeline's behavior and respondent's wife, Liz, admitted that the situation has caused a rift in the family.
Mrs. L stated that respondent is close to everyone in the family, that he is a loving father and spends a lot of time taking care of the child, characterizing the parties' child-care responsibilities as a "50/50 arrangement". Mrs. L describes respondent as a "confrontational" person and states that she loves him, but does not talk to him regularly because "[I] never say the right thing and don't want to offend him" adding that "it is not worth getting Paul upset", "he can bellow", "he's intimidating" and "he can get in your face". Mrs. L indicated that respondent suffers from some depression and a few years ago, when she suggested he seek help he became "especially angry". Mrs. L testified that at one point, respondent stopped speaking to her and withheld the child from her as well; however Mrs. L stated that they are currently on speaking terms.
All the members of the respondent's family who testified described the family as a close one and all agreed that "everyone was up for grabs" at the F family gatherings. Mrs. L concurred that "we would all laugh at one another", however she stated that respondent would "mock" and "imitate" petitioner to a point that "it wasn't funny anymore." Mrs. L's husband, Carl, testified that he witnessed respondent mocking petitioner at these gatherings and agreed that respondent can get "carried away" and that "sometimes it was not funny." All the other family members agreed that petitioner did not seem upset by the banter.
Respondent's sister Connie M testified as well and described petitioner as "sweet", "caring", "calm" and "sincere" and commented that "we all love Jenny" and that "she has been a [*14]part of our family." She described respondent as "honest", "sincere", "demonstrative", "outgoing", "overpowering" and "outspoken to get his point across" stating that "if you speak loud, he'll speak louder". Further, Ms. M characterized respondent as "authoritative, but not belligerent" and stated that respondent has a good relationship with his daughter and was a responsible parent. When asked whether respondent ever intimidated her, she replied "not to a level that would frighten me." While Ms. M indicated that she was never threatened or intimidated by respondent, she could see how petitioner might be, as respondent was "loud" when ordering petitioner to "pick up the child" or to "not be late". The witness indicated that respondent was frequently "impatient" with petitioner and at times "aggressive" and "overbearing". Ms. M's husband, Gerard testified that petitioner is "quiet" and "humble" whereas respondent is "outgoing" and "forward". He further stated that respondent has a "good relationship" with his daughter and that petitioner has always been involved in the child's life.
Respondent's mother, Anna F, testified that respondent had an "excellent" relationship with the child; taking her to Mets games, "Adventureland", restaurants and movies. Mrs. F stated that respondent was responsible for the child's upbringing, that he got her into parochial school, got the child on and off the bus and helped her with her homework". When the child was young and respondent was working at the comedy club, Mrs. F indicated that respondent would bring the child to her house for the weekend and petitioner only came to visit on Saturday afternoons. Mrs. F described her son as "loud, boisterous and fun" with "a big heart" and stated that while respondent has some depression there is "no indication of mental problems". She described petitioner as "sweet", laid back, quiet and pleasant" but claimed that petitioner was not "warm to the child" and "that there was not hugging or "kissing". Further, Mrs. F stated that the child loves respondent's wife Liz, and her stepbrother Peter, referring to them as "second mom" and "little brother".
Respondent's wife, Elizabeth F (hereinafter referred to as "Liz") testified that she met respondent at Finnegan's and has known him for four and a half years. The second time they met, she recalled that respondent spoke to her about meeting his daughter and that it was apparent that "his daughter was his life". Liz moved in with respondent shortly before they became engaged in May of 2002. Prior to her marriage to respondent in November of 2002, Liz testified that petitioner was at their house "once in a while" and that there was no set schedule, but that after their marriage, petitioner seemed "more lonely" and was there more frequently. At times, petitioner would stay over when she and respondent went out. Prior to the instant proceeding, the child never spent the night at petitioner's apartment, however in the summer of 2001, respondent did give petitioner permission to take the child to Tennessee to see petitioner's mother.
Liz stated that she got the child ready for school and did the child's laundry and that petitioner was not there in the mornings until after she and respondent were married. Additionally, she stated that she bought groceries and that petitioner did not "stock the fridge". Liz testified that petitioner works a lot and that she had difficulty getting to their house on time, frequently asking her to assist with childcare. Liz indicated that petitioner had unlimited access [*15]to their home and that she saw petitioner between two and four days per week. When petitioner went to their house in the evenings, she would arrive at approximately 7:00 p.m. and would stay until between 12:00 a.m. and 2:00 a.m., frequently using their computer and doing her bills. Liz claims that petitioner asked to borrow money on several occasions, the last time being July 4, 2003.
Liz confirmed that the parties went to Arizona with the child in August of 2003, and purchased a four bedroom house. She admits that even though she spoke to petitioner several days before they left, she did not tell petitioner that they were going, but did inform their lawyer. When asked whether she considered that fact that house hunting in Arizona might set the child up for a big disappointment if custody was awarded to petitioner, Liz replied that "it was a vacation also". Liz admitted "building up Arizona" to the child, but explained that she also told her that "we're going to court", and that she "could come and visit a lot, if you don't live with us." Liz testified that she spoke to petitioner about moving to Arizona and starting a business together, but that petitioner told her she did not wish to go.
Further, Liz stated that she and respondent had a "soft and easy conversation" with the child regarding relocation to Arizona and that she wrote the "pow-wow" notes which were admitted into evidence. Liz claimed that the discussion was not an attempt to exert influence or alienate the child from petitioner and that the notes were an "editorialized" version of the child's comments. However, she indicated that the item listed under "Cons for staying in N.Y.- What we are afraid" which states "[t]his could mean a life of drugs and high school drop out - verse - going to the best schools, going to college, because of a loving supervised normal family structure", was not discussed with the child. Liz also stated the item on the "Cons for staying in NY" - which states that the child will be "[l]onely, devistated [devastated], isolated, depressed away from the life she is used to with her family", were the respondent's words.
Liz described respondent as a "good father" who relates well to children, that he doesn't "bully" the child but sometimes "raises his voice". When she and respondent disagree, she states that respondent will go into another room and "pout" if he doesn't get his way. Liz stated that petitioner and respondent had disagreements concerning the child, but that there was no violence. Liz indicates that she is very close with the child and that they do many things together. She admits that the child calls her "second mom" or "Lizzy Wizzy" but that she doesn't try to take the place of petitioner. Liz indicates that she has a very good relationship with the child and all the witnesses agree that the child loves Liz and her step-brother Peter, very much.
Liz describes petitioner as "honest", however she fears petitioner would not be a good role model for the child based on her level of involvement, her track record, her selfishness and her constant focus on "getting a boyfriend". Liz believes that petitioner is "causing trouble" because she wants the child to stay here. Liz states that they are moving to Arizona regardless of whether respondent is awarded custody; that things are less expensive there and that they can make a better life.
[*16]
The child, Madelyn F testified in-camera and expressed clearly her desire to relocate with her father, stepmother and stepbrother to Arizona. When asked why she wished to move, she said that she "likes meeting new friends" and "really likes the hot weather". Additionally, the child acknowledged familiarity with each item on both the "Pro" and "Con" sections of the "pow-wow" notes as the Court read them to her. It was clear to the Court that the child displayed an obvious desire to appease her father, falling victim to respondent's brainwashing and efforts to alienate her from her mother.
Legal Analysis
In a custody proceeding between the natural parents of a child born out of wedlock, the preeminent concern, as in all child custody cases, is the best interests of the child (see, Eschbach v. Eschbach, 56 NY2d 167, 451 NYS2d 658 (1982), Friederwitzer v. Friederwitzer, 55 NY2d 89, 447 NYS2d 893 (1982). Factors to be considered in determining the best interests include; "the original placement of the child, the quality of the home environment, the need for stability in the child's life and the parent's ability to provide for the child's emotional and intellectual development." See Matter of Green v. Gordon, 2004 NY App. Div. LEXIS 6435 (2d Dept., May 3, 2004); Matter of Peter M. V. Joanne N., 190 AD2d 798, 593 NYS2d 560, 561 (2d Dept. 1993). "The Court's determination depends to a great extent upon its assessment of the credibility of the witnesses and upon the character, temperament, and sincerity of the parents." See Matter of Green v. Gordon, 2004 NY App. Div. LEXIS 6435 (2d Dept., May 3, 2004).
The Court has considered the evidence presented in light of the enumerated factors set forth above and finds that it is in the child's best interests that custody be awarded to petitioner, Jennifer H. This determination is not being made without recognition of respondent's love for his daughter, and the provisions he has made for her care; however, it is abundantly clear, that respondent is incapable of fostering a positive relationship between the petitioner and the child even absent relocation.
The "pow-wow" held by respondent is the most poignant example of respondent's blatant attempt to drive a wedge between the child and her mother in order to convince the child of the overwhelming benefits of relocation. The "pow-wow" notes consisted of respondent's version of the child's legacy if she is to remain with petitioner in New York and included items such as; "a life of drugs and high school drop out"; that the child "would be "lonely, devastated, isolated, depressed away from the life she is used to with her family"; that the child "will be excluded from Paul [respondent's] and Liz's family while in Jennie's [petitioner's] care because she is not welcome"; and that she will have "a role model with no boyfriends, no $, no life" - just to name a few. While respondent contends that the "pow-wow" notes were not shown to the child, the child displayed an obvious familiarity with each item contained therein in the in-camera interview conducted.
The Court concurs with Dr. Reubins' estimation of respondent's "pow-wow" as "the most compelling case of parental alienation I have ever seen." It is incomprehensible how respondent could convey such ideas to a ten year old child without considering the detrimental impact such [*17]comments are likely to have on the child's emotional well-being. (See Matter of Belden v. Keyser, 206 AD2d 610, 611, 614 NYS2d 477, 478 (3d Dept. 1994); "a campaign of insidious disparagement" by one parent against another, found to be detrimental to the child.); (See also Gage v. Gage, 167 AD2d 332, 333, 561 NYS2d 299, 300 (2d Dept. 1990) (in upholding a Supreme Court award of custody to the father, the Appellate Court relied upon the psychiatrist who found that "the mother incessantly demeaned the father, even in front of [the child]...[and] predicted that if the mother were given sole custody, there would be a serious possibility that [the child] would continue to be involved as sort of a pawn or tool [against the father] and that she would promote or try to promote [the child] with a sense of anger or outrage with his own father"). This Court is doubtful of respondent's ability to insure the child's emotional stability and is convinced that respondent would "continue to program and brainwash the child against her mother" if respondent is awarded custody and permitted to relocate to Arizona. See, Marie B. V. Karranchard B., May 3, 1993, at 31, col. 4 (Queens County Family Court, Schlinder, J.).
While it is undisputed that the child has expressed a clear desire to relocate to Arizona with respondent, "a child of [ten] lacks the maturity to weigh intelligently the factors necessary to make a wise choice as to her custody". See In the matter of Robert T. v. Rosemary F., 148 AD2d 449, 452, 538 NYS2d 605, 607 (2d Dept. 1989). When questioned why she wished to move to Arizona, her responses that "I love the warm weather" and "I like to make new friends" seemed less sincere and more programmed. In Yetter v. Jones, 272 AD2d 654, 656, 706 NYS2d. 782, 785 (3d Dept. 2000), the Court stated that "while we are not unmindful of the expressed wishes of the children, they are not controlling especially where they may be a byproduct of the influence and invectiveness of petitioner." See also Lyons v. Lyons, 112 AD2d 232, 233, 490 NYS2d 871, 872 (2d Deot. 1985); Jones v. Payne, 113 AD2d 968, 969, 493 NYS2d 650, 651 (3d Dept. 1985). The Court agrees with Dr. Reubins and the Law Guardian and finds that the child's preference is a result of the respondent's efforts to brainwash the child and alienate her from her mother; hence it is accorded little weight. See Sheri Whitley v. Jon H. Leonard, 772 NYS2d. 620, 621, 2004 NY App. LEXIS 2226 (3d Dept. 2004).
Not only did respondent show a complete disregard for the child's relationship with her mother by the "pow-wow" he held, he also sought to frustrate petitioner's temporary order of visitation by denying her Christmas day, as well as overnight visitation for New Years Eve, which the parties previously stipulated to in open court. Additionally, respondent requested visitation for Easter, even though it was to be petitioner's day and he would not be in town. Further, respondent took the child house hunting in Arizona after petitioner commenced the instant action for custody.
 The Court finds it likely, based upon the evidence adduced, that respondent will continue to interfere with petitioner's relationship with the child, if awarded custody and permitted to relocate. "Interference with the relationship between a child and a non-custodial parent by the custodial parent has been said to be an act so inconsistent with the best interests of the child as to per se raise a strong probability that the offending party is unfit to act as a custodial parent." (In the Matter of Carl J.B. v. Dorothy T., 186 AD2d 736, 737, 589 NYS2d 53, 54 (2d Dept. 1992)). Moreover, petitioner is the far more likely of the two "to assure meaningful contact between the [*18]child and the non-custodial parent." See, In the Matter of Green v. Gordon, 2004 NY App. LEXIS 6435 (2d Dept., May 3, 2004).
The "pow-wow notes" were but one example of a pattern of respondent's insidious disparagement of petitioner. The Court found petitioner's testimony as to respondent's constant berating and badgering credible; from repeatedly making petitioner the brunt of his jokes at the F family gatherings; to waking her up in the middle of the night screaming at her and calling her a "loser" and a "filthy, disgusting, animal"; to referring to her as a "spider" that "hangs around"; to the physical abuse she suffered as a result of his anger and jealousy. Further, petitioner's testimony was consistent with that of respondent's sisters, Ms. L and Ms. McEneaney, who both depicted respondent as controlling and intimidating with an ability to manipulate matters to achieve his desired objective. The effect of such character traits on respondent's ability to parent cannot be ignored. While petitioner was the subject of much of respondent's overbearing behavior, the Court is concerned that at some future point, the child may fall victim to respondent's disparagement and emotional abuse. See Rohan v. Rohan, 213 AD2d 804, 806, 623 NYS2d 390, 392 (3d Dept. 1995). It was evident from the Court's in-camera interview, that the child is already learning to that it is best to do what appeases her father.
 The Court finds that petitioner was a sincere and credible witness. Petitioner presented as a timid but kind and loving mother, committed to the well-being of her child. All witnesses, barring respondent and his mother confirmed her substantial involvement in the child's life, from birth to present. Petitioner was familiar with the child's past teachers, pediatrician , the child's physician for her asthma condition, and the child's best friend's last name, whereas respondent recalled her current teacher and the child's asthma doctor. While petitioner admittedly exhibited a history of appeasing respondent to avoid confrontation, respondent's intention to relocate with the child made such a custody arrangement unacceptable to petitioner. While the Court does not condone petitioner's prior failure to assert herself for the benefit of the child , her kindness, caring and even-tempered approach to parenting renders her far more capable of nurturing the child and providing for her emotional stability.
The Court recognizes that the child has always lived with respondent and that he has made constant provisions for care. However, "while the previous care-taking arrangement, whether the product of litigation or mutual consent, is to be accorded priority, it is but one component to be weighed..." See Finn v. Finn, 176 AD2d 1132, 1133, 575 NYS2d 591, 592 (3d Dept. 1991) citing Johns v. Johns, 156 AD2d 777, 778, 549 NYS2d 200, 202; Freiderwitzer v. Freiderwitzer, 55 NY2d 89, 94, 447 NYS2d 893, 896 (3d Dept 1991). The parties herein had a somewhat unusual arrangement whereby they lived together platonically until 1999, which allowed petitioner constant contact with the child. After petitioner moved out of the premises where respondent and the child resided, she continued to see the child regularly and stayed over frequently. According to respondent's wife, Liz, even after she married respondent in November of 2002, petitioner went over their house between two and four times per week, at times staying the night.
[*19]
While the Court determines that custody be awarded to petitioner, even absent respondent's application to relocate, the issues raised by respondent's impending move warrant some discussion. "A relocation request must be considered on its own merits with due consideration of all the relevant facts and circumstances and with predominant emphasis being placed on what outcome is most likely to serve the best interests of the child." Tropea v. Tropea, 87 NY2d 727, 739, 642 NYS2d 575, 580 (1996). It is well settled that a custodial parent may not as a matter of right remove the children to a distant geographical location so as to render the exercise of the right of visitation by the noncustodial parent impracticable." Rybicki v. Rybicki, 176 AD2d 867, 869, 575 NYS2d 341, 343 (2d Dept. 1991); Coniglio v. Coniglio, 170 AD2d 477, 477, 565 NYS2d 834, 835 (2d Dept. 1991). Where "both parents have a close and loving relationship with the child and have taken active part in his upbringing and well-being [and] the parties lived close to each other, enabling frequent visitation [and] the child developed a strong and loving relationship with various members of the father's extended family, who also live in the area under the totality of the circumstances, it cannot be said that the child's best interests are served by the relocation." Huston v. Jones, 252 AD2d 502, 503, 675 NYS2d 127, 128 (2d Dept. 1998).
Here, despite respondent's de-facto custody of the child, petitioner and respondent have always played an integral part in the rearing of their child. It was evident from the testimony of the witnesses, that petitioner saw the child on a regular basis, always living in close proximity and "interacted with the child in family, social and school matters." See Zarou v. Levine, 216 AD2d 292, 293, 627 NYS2d 790, 790 (2d Dept. 1995). Additionally, the child developed close relationships, particularly with respondent's parents and sister Madeline, as well as the other members of respondent's extended family who reside in or around Suffolk County, New York. The Court believes that petitioner will continue to foster those relationships.
It must be noted that the Court recognizes that separation of siblings is disfavored and in no way means to minimize the child's relationship with her thirteen month old step-brother; however, the overwhelming evidence dictates that the child's best interests would not be served if the Court permitted this factor to control. In accordance with the opinion of the forensic psychologist and the Law Guardian , and under the totality of the circumstances herein, the Court finds that the child's removal from petitioner and the other members of respondent's extended family to a distant locale, such as Arizona, would not be in the child's best interests.

Despite respondent's contention that petitioner will be unable to financially provide for the child, petitioner has shown a consistent and steady increase in positions and salaries from 1994, earning $22,000.00 per year with "A & S" Department Store to 2003 earning $57,000.00 (excluding bonuses) as head buyer for "Foxes" shoe store. Respondent, on the other hand, most recently sold his business, Finnegan's, which was on a spiral decline, to accept a position in a restaurant in Arizona as shift supervisor at $11.00 per hour . While respondent has aspirations to open a restaurant of his own, even he admitted the high rate of failure in such a business. Further, petitioner testified to her ability and intention to secure a two bedroom apartment in Huntington for her and the child if she is awarded custody and to continue the child in the private school she currently attends.
[*20]
Accordingly, the Court with due deliberation having considered the entirety of the evidence in the instant case, finds that it is in the child's best interests that petitioner be awarded custody of the child with visitation to respondent. The Court finds that petitioner is most equipped to provide for the child's emotional and intellectual development as well as her emotional and mental stability and is clearly more capable of fostering a positive relationship with the non-custodial parent. Additionally, the Court finds petitioner fully able to provide for the child's needs and offer a secure and loving home environment. If the parties are unable to agree on visitation, then they are directed to submit proposed visitation schedules to the Court for the Court to enter an appropriate order.
Furthermore, petitioner is directed to arrange for and participate in family counseling with the child, in order to deal with the child's resentment likely to result from the Court's denial of respondent's application to relocate to Arizona. Moreover, counseling may serve to repair damage respondent caused to the mother-daughter relationship by his constant disparagement and cruelty toward petitioner outside of and in the child's presence. Additionally, respondent is directed to refrain from any disparagement of petitioner in the presence of the child or other acts designed to alienate the child from petitioner. Respondent is also directed to participate in counseling and shall attend and complete a parent effectiveness training class so as to learn to cooperate with petitioner in furtherance of the well-being of the child.
This constitutes the final order of the Court.
ENTER
 
 HON. ETTORE SIMEONE
 J.F.C.